IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JESSE SCHWORCK, DYLAN BANGERT,
and LION OF JUDAH HOUSE OF
RASTAFARI,

                Plaintiff,

    v.

CITY OF MADISON,
JENNIFER ZILAVY,
JASON FREEDMAN,
KYLE BUNNOW, and
CHARANJEET KAUR,

                Defendants.

OPINION and ORDER

19-cv-312-wmc

This federal lawsuit is one of several court proceedings arising from Jesse Schworck's and Dylan Bangert's efforts to possess, use *and* distribute marijuana as purported founders and members of the named co-plaintiff, "The Lion of Judah House of Rastafari" ("The Lion"). In April of 2019, plaintiffs allegedly started operating The Lion as a church on property located at 555 West Mifflin Street, Madison, Wisconsin ("the property"), publicly advertising its mission to distribute cannabis product to "church members" in exchange for donations. Not surprisingly, the City of Madison Police Department ("MPD") started investigating The Lion's practices, and by June of 2019, the State of Wisconsin had filed several criminal charges against Schworck and Bangert, which are ongoing. Plaintiffs were also evicted from the property in October of 2019, because their marijuana possession and distribution practices were deemed to have violated the lease.

During this same timeframe, Schworck and Bangert sought to change the classified use of the property they were leasing to a "place of worship." However, that process was

1

also stalled when City zoning inspectors identified multiple hazardous conditions and several ordinance violations. This led to a municipal court proceeding charging Schworck with several ordinance violations. Ultimately, a default judgment was entered against Schworck with respect to the municipal ordinance violations, and the property was never classified as a "place of worship" for zoning use purposes.

Plaintiffs Schworck, Bangert and The Lion filed this lawsuit on April 18, 2019, shortly after City officials began challenging their use of the property. Plaintiffs now emphasize that they do not seek to disturb the criminal or eviction proceedings; instead, in their Third Amended Complaint, plaintiffs seek monetary damages (and related declaratory and injunctive relief) from the City of Madison, Assistant City Attorney Jennifer Zilavy, MPD Captain Jason Freedman, City Plan Review and Inspection Supervisor Kyle Bunnow, and the person from whom they leased the property, Charanjeet Kaur. As grounds for this narrowed relief, plaintiffs continue to allege claims under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc to 2000cc-5,[1] the First Amendment's Free Exercise Clause, the Fifth Amendment's Due

---

[1] Plaintiffs do not specify which subsection of RLUIPA forms the basis of their claim. However, plaintiffs reference the City's substantial burden on their right to free exercise. As a result, defendants frame plaintiffs' RLUIPA claim as being brought under its free exercise provision, 42 U.S.C. § 2000cc(a)(1). Since plaintiffs do not contest defendants' characterization of their claim (or suggest that they are pursuing any other theory of relief), plaintiffs are deemed to have waived any objection to defendants' or the court's treatment of their RLUIPA claim as one for substantially burdening their free exercise of religion. *Wojitas v. Capital Guardian Trust Co.*, 477 F.3d 924, 926 (7th Cir. 2014); *Cincinnati Insurance Co. v. Eastern Atlantic Insurance Co.*, 260 F.3d 742, 747 (7th Cir. 2001).

Process Clause, the Fourteenth Amendment's Equal Protection and Due Process Clauses, and the Wisconsin Constitution.

Pending is a motion for summary judgment on behalf of the City, Freedman, Zilavy and Bunnow (dkt. #71), which the court will now grant for the reasons set forth below. In addition, since defendant Kaur has never been served with the Third Amended Complaint, nor has she participated in the proceedings in any manner, the court will dismiss her without prejudice at the outset for plaintiffs' failure to timely serve her. *See* Fed. R. Civ. P. 4(m) ("If a defendant is not served within 90 days after the complaint is filed, the court -- on motion or on its own after notice to the plaintiff -- must dismiss the action without prejudice against that defendant or order that service be made within a specified time."). As for the remaining defendants' motion for summary judgment, the evidence of record does not support a finding that they substantially burdened plaintiffs' religious exercises under RLUIPA, nor that defendants conspired to violate their constitutional rights. Therefore, the court will grant defendants' motion for summary judgment, and dismiss plaintiffs' remaining state law claims.

UNDISPUTED FACTS[2]

## A.     Plaintiffs' religious beliefs

Plaintiff Schworck attests that The Lion provides a refuge for those without shelter

---

[2]  Unless otherwise noted, the following facts are material and undisputed. The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying evidence submitted in support, all viewed in a light most favorable to plaintiff as the non-moving party.

and a place for homeless members to camp.  He further attests that the exercise of his religion involves "sacramental use of cannabis, as well as providing food, clothing, guidance, friendship, inexpensive or free recreational items, and even shelter to our community." (Schworck Decl. (dkt. #90) ¶ 6.)  Bangert has not attested to his personal religious beliefs, and the Third Amended Complaint does not detail plaintiffs' sincerely held religious beliefs or practices with any more particularity.

### B.    The Lion's effort to alter the City zoning of the property from retail to religious use and related ordinance violations

From April through their October 16, 2019, eviction, plaintiffs operated The Lion from the property which had been leased as retail space from Charanjeet Kaur.  Before The Lion's tenancy at 555 West Mifflin, the property operated as "Harry's Market," which sold food items.  Consistent with this use, the City of Madison had issued a certificate of occupancy on June 21, 2017, listing the property's use as "food and related goods sales" and "liquor store."

On February 11, 2019, however, the City received an application and $75 application fee for a certificate of occupancy for the property, which included a request to use the property as a church.  That same day, the City's Zoning Inspector, Trent Schultz, issued a Building Permit for the site, along with an "Owner Permit Help Sheet" that stated in part:

> You have now completed the first phase of your project by obtaining a permit.  The next phase is the inspection/construction phase.  All projects require inspections during construction.  If you have a specific question or wish to call for an inspection, please call the appropriate inspector listed below between 7:00 and 8:30 a.m.

4

(Schultz Decl., Ex. D, dkt. #78-4.)  The Building Permit displayed a grid that identified the "Project" as "Certificate of Occupancy for a Change in Use -- Rastafari Church," and included the following warning:

> NOTICE OF NON-COMPLIANCE
> This issuing jurisdiction shall notify the applicant in writing of any violations to be corrected.  All cited violations shall be corrected within 30 days after notification, unless extension of time is granted.

Thus, while the City had not yet issued a Certificate of Occupancy for the proposed church, the City Zoning Inspector had issued a Building Permit to bring the proposed use of the building into compliance with any municipal ordinances and the proposed use -- "place of worship" -- was generally considered appropriate for that zoning district (an Urban Mixed -Use District).  Indeed, plaintiffs cite to MGO 28.183(10), a provision of the City's zoning code related to conditional uses, and assert that the property did not require a conditional use, since it was already approved as a place of worship.

After The Lion obtained the necessary Building Permit, however, it still had to complete multiple steps to obtain a certificate of occupancy for use of the building as a "place of worship," since this use involved certain requirements that do not generally align with buildings used for "food and related goods sales" and "liquor store."  For example, fire protection standards differ, and there is a different metric to measure occupant load capacity, which also affects building exit and bathroom requirements.  In addition, the necessary physical changes to convert the use to "place of worship" meant that another Building Permit would be necessary, and that supplemental Building Permits might be necessary for subcontractor jobs.  Further, regardless of what changes it would need to

make to the property, The Lion would need to obtain a certificate of occupancy, certifying the completion of the required work for the change of use process.

The Lion never submitted building plans for the proposed change of use, and it never obtained approval from the building and fire inspectors for the changes necessary to comply with that use. Similarly, the City never issued a certificate of occupancy for the building to be used as a church. Nevertheless, for purposes of this suit, plaintiffs maintain that City officials were aware that The Lion *was* operating as a place of worship, and it had allowed that use to proceed. As evidence, plaintiff submit multiple, alleged email communications, some, as early as March of 2019, between City Building Inspector James Sjolander, plaintiff Schworck and the property's lessor Kaur, in which Sjolander purportedly permitted The Lion to operate as a church. (*See* Pl. PFOF (dkt. #96) ¶¶ 1-6.) However, plaintiffs have not authenticated the emails, nor have they submitted proposed findings of fact to this effect in accordance with this court's summary judgment procedures.[3] Regardless, the emails show only that Sjolander reminded plaintiffs of their continuing obligation to obtain permits, as well as that occupancy limits would be imposed based on the sizes of the offices in the building. (*See* dkt. #87-4.) As such, there is no genuine, material dispute of fact that the City officials never "allowed" plaintiffs to operate as a church without a certificate of occupancy.

---

[3] Plaintiffs have submitted proposed findings of fact related to the *possibility* of obtaining a Certificate of Occupancy/Change of Use without a building permit. (Pl. PFOF (dkt. #96) ¶¶ 9-10.) However, these proposed factual findings are immaterial to whether the property was ever issued a Certificate of Occupancy.

6

On May 29, City of Madison Building Inspector James Sjolander inspected the property.  During his inspection, Sjolander noted problems, including electrical and HVAC work done without required inspections and permits, electrical work in a state of dangerous disrepair, 4-6 inches of standing water in the basement, and people camping in a tent in the driveway of the property.  Sjolander recorded those problems on the Code Enforcement Worksheet.

Plaintiffs dispute Sjolander's observations to varying degrees.  First, while Schworck concedes that there was water damage, he maintains that no waterline suggests that there was 4-6 inches of standing water.  Second, he maintains that the alleged HVAC work was just removing a missing ceiling tile and putting in a tube that was not connected to a system.  (Schworck Decl. (dkt. #90) ¶ 24.)  Regardless, relying on MGO 27.08(2)(a), Sjolander determined that the condition of the property created a serious hazard to the health and safety of its occupants.

That same day, May 29, following the execution of a search warrant, plaintiffs Bangert and Schworck were arrested and later charged with criminal violations, which are discussed below.  On May 31, Bangert and Schworck were released on bail, but forbidden from being on the subject block of West Mifflin street, including 555 W. Mifflin.

On June 7, City Inspector Sjolander issued an Official Notice to Schworck and Kaur, listing the ordinance sections violated and stating that the corrections had to be made by June 20, 2019.  On June 21, Sjolander re-inspected the property, observing that the corrections he noted as required in the Official Notice had not been made.

On July 15, the bail conditions prohibiting Bangert and Schworck to be near or on the property were lifted, and during the week of July 17, the Building Inspection Division learned that they had re-occupied the building. Moreover, when Inspector Sjolander attempted to inspect the building once again on July 21 to determine whether the hazardous conditions remained, he was not permitted to enter the building by the occupants of the building. The next day, the City's Building Inspection Division posted a notice under MGO 27.08(2), which forbid occupancy in the building until the City's Inspection Unit approved the correction of the previously cited code violations.[4] In contrast, plaintiffs' position is that: Inspector Sjolander was asked to leave because his behavior was unacceptable after a heated exchange between the occupants and Sjolander about the potential cost of citations and the damages the church would owe. (Schworck Decl. (dkt. #90) ¶¶ 16-17, 19.)

On July 26, the City of Madison next filed a complaint against Schworck and Kaur in Municipal Court, Office Notice No. CB2019-155-03918, alleging the following ten violations of the Madison General Ordinances:

1. MGO 29.05(1), requiring a building permit to alter a building.
2. MGO 29.08(1), requiring approval of the Director of the Building Inspection Division before covering certain elements of the building.
3. MGO 29.08(2), requiring successive inspection and approval at different stages of constructions.

---

[4] Plaintiffs submit multiple proposed findings of fact challenging the amount of time Sjolander gave to vacate the building. However, the amount of time given to vacate does not relate to any claim upon which plaintiffs are proceeding, so these proposed findings of fact appear to be immaterial.

4. MGO 29.09(2), requiring a certificate of use and occupancy when the building changes from one use to another.

5. MGO 26.19, requiring compliance with Wis. Admin. Code § 362.1101(2m), regarding accessibility.

6. MGO 19.09, requiring certain electrical work to be performed by a licensed electrician.

7. MGO 19.10, requiring a permit to perform certain electrical work.

8. MGO 19.12, requiring inspection of certain electrical work.

9. MGO 30.01(9), requiring a permit to perform certain HVAC work.

10. MGO 30.01(11), requiring inspection of certain HVAC work.

(Sjolander Decl. (dkt. #79) ¶ 12; Ex. C (dkt. #79-3).)

On July 29, Attorney Delyea, acting as counsel for plaintiffs Bangert, Schworck and The Lion, contacted Sjolander at the City's Building Inspection Division, writing that:

> The Lion of Judah hopes the City of Madison will work with us to resolve these minor issues and major misunderstandings, as the Lion of Judah and its followers continue to suffer great harm. The Lion of Judah serves the homeless, the mentally ill, the disenfranchised, as well as the successful and spiritually balanced. . . . The need is great, and the violations minor, please do not cause people to suffer for a couple of wires and an aluminum tube.

(Sjolander Decl. (dkt. #79) ¶ 13.)

The next day, defendant Kyle Bunnow, City of Madison Plan and Review Inspection Supervisor, responded by email, stating in relevant part that:

> The property at 555 W Mifflin St has been posted "No Occupancy" due to the hazardous conditions observed during an inspection conducted on May 29, 2019. The hazardous conditions included but are not limited to unpermitted and unauthorized electrical work having been completed in the building and a large amount of standing water. At this time, use of the building was discontinued while legal proceedings were ongoing and the need [to] formalize this determination

was not necessary due to the vacancy of the building.  The week of [July 17, 2019][5] Building Inspection was notified the building at 555 W Mifflin had been reoccupied and an attempt to conduct an inspection of the conditions of the building was made on [July] 21, 2019.  At the time the inspection attempt was conducted, the occupants refused inspector Sjolander entry to the building. . . .  If your client believes they have corrected the hazardous conditions and are willing to arrange for an inspection of the site, [B]uilding Inspection would be happy to confirm and determine if the "No Occupancy" posting can be removed.

Please note, the "No Occupancy" is specific to the hazardous conditions created in the building.  This does not represent the total work needing to be completed to bring the building into a fully code compliant state, specifically alterations needed for a change in use from the approved mercantile use to places of religious worship.

(Sjolander Decl. (dkt. #79) ¶ 14; Bunnow Decl. (dkt. #74) ¶ 3.)

On August 1, Brian Linaberry, a City of Madison Code Enforcement Officer, *was* permitted to inspect the property.  During the inspection, Linaberry confirmed that the hazardous conditions had been alleviated, and the City removed the "No Occupancy" posting.

The only other evidence of plaintiffs' efforts to correct the ordinance violations is an allegation in their Third Amended Complaint that their plumber was denied a permit to do work on the property on or around September 9, along with Schworck's statement confirming that their plumber was going to fix or repair the sump pump in the building, but was denied a permit.  (*See* dkt. #87, at 37; Third Am. Compl. (dkt. #60) ¶¶ 52-53; Schworck Decl. (dkt. #90) ¶¶ 4-5.)  Specifically, plaintiffs have not submitted a proposed

---

[5] The email actually states that the date was *June* of 2019, but it appears that Bunnow intended to write "*July* 17, 2019."

finding of fact related to exactly what the plumber intended to remediate other than a "sump pump," nor do their responses to defendants' proposed findings of fact reference a denial of a plumber, so evidence related to any work the plumber intended to do is not properly before the court.[6]  *See Hedrich v. Board of Regents of Univ. of Wisconsin Sys.*, 274 F.3d 1174, 1178 (7th Cir. 2011) (courts are to consider only evidence set forth in proposed finding of fact with proper citation).

As to the remaining ordinance violations, on November 4, 2019, the Madison Municipal Court conducted a hearing at which defendant Kaur appeared by counsel, but plaintiff Schworck failed to appear in person or through counsel.  Following the hearing the Madison Municipal Court entered an order granting default judgment, which Schworck never moved to reopen or appealed.

### D.    Criminal charges related to marijuana possession and distribution

As far back as March 26, 2019, the MPD was also dispatched to the subject property in response to a report about an outside speaker producing loud noise and suspected drug dealing.  While MPD was at the property on March 26, plaintiff Schworck informed MPD Officer Clarice Gloede that The Lion is a non-profit church, and that members provide donations in exchange for cannabis.  That day MPD seized over 200 grams of marijuana, packaged in various forms.

---

[6]  In their reply brief, defendants also cite an alleged email from the City to Attorney Delyea, explaining that the permit was denied because the plumber was unable to answer questions about the project.  (*See* dkt. 72, at 10-11.)  However, this email has not been submitted as evidence of record, so the court has excluded it from the discussion above.

On April 8, an undercover police officer further reported conducting a "controlled buy" at the property, purchasing 4.9 grams of marijuana from The Lion for $50.  The following are three photos of the subject property from within the store looking out on, and from outside the store front looking in from North Bedford Street, and at the corner entrance to the store, respectively, taken during an April 9, 2019, inspection:







(Schultz Decl., Ex. A (dkt. #78-1).)

On April 12, an undercover MPD officer reported purchasing 4.0 grams of marijuana from The Lion for $40. Also, on April 12, defendant Assistant City Attorney Jennifer Zilavy directed a letter to plaintiffs Schworck and Bangert, advising that they "must immediately cease and desist from continuing to possess and sell, or offering to sell" marijuana at the property and noting Madison Police's visit there on March 26, resulting in the confiscation of several jars of marijuana and drug paraphernalia, including a scale. (Zilavy Decl., Ex. A (dkt. #81-1).) Zilavy further noted that there was a sign at the establishment advertising "THC edibles," and specifically advised that selling those items was "not legal either in the City of Madison or in the State of Wisconsin," citing to Wis. Stat. §§ 961.14, 961.41, 961.42(1), 961.57(b). (*Id.*)

Two weeks later, on April 26, the Wisconsin State Journal next reported that defendant Kaur met with Madison Police Captain Freedman and Assistant City Attorney Zilavy to discuss her options. The news report further observed that if Kaur failed to take any corrective action, "state law allows the city to seek a court order to declare the property

a public nuisance and order the building closed and sold with proceeds retained by alcohol and drug abuse," although the article did not attribute this statement to either Freedman or Zilavy.

Next, on May 9, an undercover officer purchased another 2.0 grams of marijuana from The Lion for $20.  Then, on May 24, Schworck reportedly struck a man with a baseball bat after he left the building without paying for the marijuana he took.  Then, on May 28, an undercover officer purchased 112.1 grams of marijuana from a website registered to Schworck (rastajoint.com), which was picked up at The Lion.

Finally, on June 4, the State of Wisconsin filed a criminal complaint, charging plaintiffs Schworck and Bangert with several felony and misdemeanor counts.  Specifically, Schworck was charged with:  three counts of manufacture/delivery of THC (<=200g) in violation of Wis. Stat. § 961.41(1)(h)(1); battery with use of dangerous weapon -- Misd. A in violation of Wis. Stat. §§ 940.19(1), 939.63(1)(a); disorderly conduct with use of dangerous weapon -- Misd. B in violation of Wis. Stat. §§ 947.01(1) & 939.63(1)(a); possession with intent - THC (>2500-10,000g) -- Felony F in violation of Wis. Stat. § 661.41(1m)(h)(4); and maintaining a drug trafficking place -- Felony 1 in violation of Wis. Stat. § 961.42(1).  In turn, Bangert was charged with:  manufacture/deliver TCH (<=200g)  -- Felony 1 in violation of Wis. Stat. § 961.41(1)(h)(1); possession with intent - THC (>2500-10,000g) -- Felony F in violation of Wis. Stat. § 961.41(1m)(h)(4); and maintaining a drug trafficking place -- Felony 1 in violation of Wis. Stat. § 961.42(1).

While both Bangert and Schworck moved to dismiss the criminal charges, arguing a constitutional right to use and distribute marijuana, Dane County Circuit Court Judge

14

Jill Karofsky denied those motions in an oral ruling on February 27, 2020.  In denying the motions, Judge Karofsky found "a compelling interest of this state to control and regulate possession and sale of marijuana, . . . that cannot be served by a less restrictive alternative." This case remains open and currently is scheduled for trial.  *See State v. Schworck*, No. 2019CF1228 (Dane Cty.), *State v. Bangert*, No. 2019CF1217 (Dane Cty.), *available at* https://wcca.wicourts.gov/ (last visited May 6, 2021).

###    E.    The Eviction Proceeding

On June 3, 2019 (the day before the criminal charges were filed) lessor Charanjeet Kaur also initiated an eviction proceeding against plaintiffs Schworck, Bangert and The Lion, to evict The Lion from the 555 West Mifflin property.  *Kaur v. Schworck*, No. 19SC3702 (Dane Cty.).  In particular, Kaur asserted that The Lion violated its lease agreement by using the building for an unlawful purpose and allowing a nuisance on the premises.  During those proceedings, Attorney Delyea appeared for The Lion, as well as Schworck and Bangert.

Plaintiffs claim that after Kaur initiated the eviction proceeding, they worked out an informal deal with her to stop the eviction proceedings.  However, their proposed findings of fact do not support this claim; instead, plaintiffs reference "July 15, 2019," in their opposition *brief*, and cite to the following paragraph from Schworck's declaration:

> To remain at 555 W. Mifflin Street, we agreed and promised Ms. Charanjeet Kaur that while our case was pending in federal court we would agree to the following if she allowed us to stay: a.  limit our sacrament to hemp and not allow others to use cannabis . . . ; b. comply with the building inspector's demands. c. pay rent on time.

(Schworck Aff. (dkt. #90) ¶ 8.)  There is *no* evidence or explanation of exactly what supposedly happened on July 15, 2019.  Moreover, plaintiffs have submitted no evidence that would permit a reasonable trier of fact to find an actual amendment to the terms of the written lease, nor that any of the defendants were aware of this supposed side-agreement, including Kaur.[7]

Regardless, on October 16, 2019, Dane County Circuit Court Judge Stephen Elke issued an oral ruling that The Lion had violated the lease terms and Kaur was entitled to evict them, effective that day.  During that hearing, Schworck, Bangert and The Lion also conceded that:  (1) The Lion possessed and distributed marijuana; and (2) if the use, possession and distribution of marijuana was not constitutionally protected, then the landlord was entitled to eviction.  In deciding the eviction, Judge Ehlke did not make any determination as to the municipal ordinance violations, nor did he suggest that plaintiffs were violating City ordinances by operating as a church on the property.  Rather, the judge relied upon Section 11 of the lease, which provided that The Lion "shall not allow the premises to be used for any immoral or unlawful purpose and shall not allow any waste or nuisance on the premises."  (*Id.*; Kaur Decl., Ex. A (dkt. #75-1) 3.)  Judge Ehlke further considered whether The Lion violated Wis. Stat. § 823.113, titled "Drug or criminal gang house a public nuisance."  Finally, he rejected the tenants' constitutional defense, finding it "well established that the State has a compelling interest in regulating controlled substances," including marijuana.  (Tenebruso Decl., Ex. B. (dkt. #80-2) 5.)  After finding

---

[7] Even though this evidence is not properly before the court, it is included since plaintiffs rely heavily on this so-called "agreement" to support their theory that the eviction proceedings were part of a conspiracy between City officials and Kaur.

eviction was warranted, the circuit court further denied the tenants' request for a stay pending appeal or this federal lawsuit, reasoning that there was not "a lot of room for argument" on the question of the constitutionality of their marijuana-related practices.

### F.     The Lion's ongoing advertisement of its marijuana distribution

The following are screenshots from The Lion's Facebook page, from October 2, November 2 and December 8, 2018, and March 21 and August 12, 2020:



[8]

---

[8]  The court has redacted non-party names from this image.

 **Lion Of Judah, House Of Rastafari, Inc.**
Just now · 🌐

 Lion Of Judah, House Of Rastafari
· November 2, 2018 · 🌐

520 university ave Madison wi
Lion of Judah House of Rastafari
Not for profit church.
♡Free Cannabis sacrament available for
members. Donations only





Lion Of Judah, House Of Rastafari
Like This Page · December 8, 2018 · 🌐

18



**Lion Of Judah, House Of Rastafari**
March 21 at 4:56 AM · 🌐

Big update: we will have free delivery for all of our members in the general dane county area who donate 100$ or more. In this time of essential business. Serving Jah.. and keeping a non deficient #EndocanabinoidSystem so our body mind and spirit can fight of all evil..including any illness. Inbox or text 6085152866



YOU SEE A DRUG
I SEE MEDICINE

@JENNNNNICOLE

YOU SEE MEDICINE
I SEE A DRUG

EXHIBIT
F

WE ARE NOT THE SAME

👍❤️ 18                                    3 Comments  4 Shares



(Tenebruso Decl. (dkt. #80) ¶¶ 5-8; Tenebruso Exs. C, D, E, F, G (dkt. ##80-3 to 80-7).)

Similarly, defendants provided a video posted to The Lion's Facebook page on March 22, 2020, in which Schworck offered encouragement to "keep the herb burnin," states "we still got the church open - we got some brothers that can help out with delivery," and provides contact information to facilitate delivery.

## G.    The City's treatment of other churches

In plaintiffs' Third Amended Complaint, they also allege that The Lion was discriminated against with respect to the Certificate of Occupancy requirement, inserting a chart listing 11 properties in Madison that came up in a search on Yelp.com for "the best churches in Madison."  (Dkt. #60 ¶ 40.)  Plaintiffs allege that only two of the properties

have been listed as "Church" on the City of Madison property assessor's website. Based on this information from Yelp.com and the City's property assessor website, plaintiffs claim that the other properties were "exempted" from the Certificate of Occupancy requirement. (Dkt. #60, ¶ 40.)[9]

In fairness, plaintiffs do offer three, specific comparisons to prove that The Lion received less preferential treatment. First, plaintiffs submit evidence related to The Vine Church of Madison. The Vine Church paid for and received an application of occupancy and building permit on December 16, 2016, although a Certificate of Occupancy for use as a place of worship did not issue until February 28, 2019.[10] However, the evidence also shows that The Vine Church received final approvals: Zoning was approved December 16, 2016; Heating was approved March 21, 2017; Electrical was approved March 24, 2017; Building was approved March 28, 2017; and Fire Prevention was approved February 21, 2019. Additionally, as a part of converting the approved use of The Vine Church's building, a professional engineer submitted plans to the City for approval, which were

[9] As part of defendants' response to this limited evidence, defendant Bunnow attests that the property assessor's website is not a reliable source for the classification of a property. Instead, the definitive source for use of property is the actual Certificate of Use for that property. (Bunnow Decl. (dkt. #74) ¶¶ 4-6.) Although plaintiffs' purport to dispute defendants' position about the accuracy of the property assessor's website, they submit no evidence to dispute Bunnow's statement. Ultimately, the court finds any actual dispute is not material for reasons explained in the opinion below.

[10] Plaintiffs also claim that beginning on or around March 19, 2017, through February 21, 2019, The Vine Church was allowed to assemble and operate as a church without a Fire Prevention or Certificate of Occupancy. However, plaintiffs' evidence in support is a March 16, 2017, Facebook post in which The Vine Church invited members to its location at 906 Ann Street. (Dkt. #87-2.) This "evidence" was not accompanied by an authenticating declaration, and contains hearsay. Regardless, any evidence that *The Vine Church* may have held a gathering does not establish *defendants'* knowledge, much less render defendants' enforcement here subject to challenge. *See infra* at 38-40.

granted.  The Vine Church also submitted building code plans, obtained the required permits, *and* completed the required inspections to obtain final approval for occupancy as a place of worship.

As for plaintiffs' evidence with regard to the City's record of permits or change of use fees for two other churches, Blackhawk Evangelical Free Church, Inc. ("Blackhawk") was conveyed property in August of 2016.  Although there is no record of building permits or change of use between January of 2016 and October of 2020, defendants submit undisputed evidence that the property on which Blackhawk operates has been approved for use as a church since 2007.  In addition, Journey Church was conveyed property in October of 2017, with its last permit for the property issued on September 21, 2017, before the conveyance.  While the job description was to "convert existing brass foundry into a community center," there is no subsequent permit or change of use record.  However, defendants submit evidence that the Journey Church received a Certificate of Occupancy and Plan Examination Letter.  Furthermore, Bunnow attests that for the properties on which Blackhawk and Journey Church operate, building code compliant plans were submitted, the required permits were obtained, and the required inspections were completed to obtain final approval for occupancy and use of both spaces as a church.

OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  If the moving party meets this burden, then the non-moving party

must provide evidence "on which the jury could reasonably find for the nonmoving party." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted).  While disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party, this treatment does not extend to inferences supported merely by speculation or conjecture.  *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019).  Defendants seek summary judgment on all of plaintiffs' federal claims, each of which the court addresses below.

## I.     Section 1983 Claims Against Defendant Zilavy

As an initial matter, defendants seek summary judgment with respect to any claim against Zilavy for monetary damages, citing prosecutorial immunity.  *See Imbler v. Pachtman*, 424 U.S. 409, 430-31 (1976) (prosecutors are entitled to *absolute* immunity for conduct associated with the judicial phase of the criminal process).  While there are limits to prosecutorial immunity, the focus is on conduct.  *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).  What matters is "the nature of the function performed."  *Forrester v. White*, 484 U.S. 219, 229 (1988).  In particular, a prosecutor's conduct intimately associated with the judicial phase of the criminal process -- including initiating a prosecution and in presenting the state's case -- is covered by absolute immunity.  *Buckley*, 509 U.S. at 270 (citing *Imbler*, 424 U.S. at 430-31).  This immunity extends to public nuisance actions.  *See Smith v. Power*, 346 F.3d 740 (7th Cir. 2003) ("[A]bsolute immunity protects prosecutor for filing public nuisance action and civil forfeiture complaint.") (citation omitted).

Plaintiffs concede that Zilavy is immune from liability for her actions taken as a prosecutor, but suggest that she may be held liable for the actions taken prior to "on or about July 22, 2019." (Dkt. #87 at 47.) Plaintiffs cites to two cases finding prosecutors were not immune from suit, but neither are analogous to Zilavy's challenged conduct here. In both *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993), and *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014), an action against a prosecutor was allowed to proceed because the challenged conduct involved the prosecutor's *investigative* conduct, not conduct undertaken as a prosecutor. Specifically, in *Buckley*, the plaintiff charged the prosecutor with falsifying evidence when investigating the case, 509 U.S. at 275; and in *Fields*, the prosecutor was charged with falsifying evidence before the suspect's arrest, 740 F.3d at 1111. In contrast, Zilavy's challenged conduct related to her role as the Assistant City Attorney, seeking to enforce the City's rights under Wisconsin law. Specifically, she not only sent the cease and desist letter to plaintiffs on City Attorney letterhead, she directed plaintiffs Schworck and Bangert to cease and desist a drug nuisance taking place at the property.[11]

Obviously, plaintiffs dispute the accuracy of Zilavy's statements, but plaintiffs have not explained how Zilavy took any wrongful investigatory action related to her statements in the letter. Regardless, her statements were conclusory, and she cited applicable law. *See Smith*, 346 F.3d at 743 (city prosecutor's 15-day notice issued prior to filing suit for an

---

[11]  Plaintiffs also cite to the April 26, 2019, Wisconsin State Journal article mentioning the City's ability to declare the property a public nuisance and to order the building closed and sold. (*See* dkt. #87-13, at 5.)  As noted above, however, that article did not quote Zilavy as making this public statement, so it has no relevance to whether she is entitled to absolute immunity for her personal conduct in this case.  Even if it did, there is no allegation that these statements would be actionable by themselves.

24

order for demolition was "a preliminary act for which [the prosecutor was] absolutely immune) (citing *Thomas v. City of Dallas*, 1745 F.3d 358, 362-63 (5th Cir. 1999); and *Pusey v. City of Youngstown*, 11 F.3d 652, 658 (6th Cir. 1993)).  Given that there is no evidentiary basis to conclude that Zilavy's involvement in the property extended beyond her role in prosecuting alleged ordinance violations, there is no basis to conclude that she was not acting in her enforcement role with respect to the conduct plaintiffs would now challenge.  Accordingly, although Zilavy's subsequent actions may be relevant to plaintiffs' claims for injunctive relief, she is absolutely immune from any monetary damages in this lawsuit.

## II.     Ripeness & Relevance of RLUIPA Claim

Defendants seek summary judgment on plaintiffs' RLUIPA claim on multiple grounds, including two that would bar consideration of the merits:  (a) the court cannot reach the merits of their RLUIPA claim because plaintiffs' RLUIPA claim is not ripe for this court's review; and (b) in any event, their claims against defendants do not implicate RLUPA.  The court addresses each of these arguments briefly in turn, but ultimately is not persuaded that either bars reaching the merits of plaintiffs' claim.

### A.     Ripeness

Under the ripeness standard applicable to land use claims, a plaintiff may initiate an action when "the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue."  *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985), *overruled on other grounds by Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct.

2162 (2019); *Church of Our Lord & Savior Jesus Christ v. City of Markham, Ill.*, 913 F.3d 670, 678 (7th Cir. 2019) (noting that "the Supreme Court's ripeness test for Takings Clause claims . . . requires a plaintiff to obtain a 'final decision' from a local government about how it may use its property before ripening a claim").[12]  In *Williamson County*, the Court articulated a "finality requirement" with two components necessary to ripen a takings claim for federal judicial review:  a plaintiff must (1) receive a final state agency decision *and* (2) exhaust state court remedies.  473 U.S. at 186.

Here, defendants contend that *Williamson* precludes finding plaintiffs' RLUIPA claim ripe because they never received a final decision with respect to their ability to use the property as a place of worship.  However, in *Church of Our Lord*, the Seventh Circuit indicated it would be disinclined to apply the finality test from *Williamson* to RLUIPA claims.  Indeed, the court emphasized that except for extending the finality test to due process claims largely parroting a parallel Takings Clause claim, the Seventh Circuit has explicitly declined to apply that test to non-Takings Clause challenges to local zoning codes.  *Church of Our Lord*, 913 F.3d at 678 (citing *Triple v. Landfills v. Bd. of Comm'rs of Fountain Cty.*, 977 F.2d 287, 289 (7th Cir. 1992) (final decision test does not apply to challenges to validity of zoning ordinance); *Forseth v. Village of Sussex*, 199 F.3d 363, 370-

---

[12] While the state exhaustion requirement was recently overruled in *Knick*, the Court did *not* disturb the finality requirement.  *See Knick*, 139 S. Ct. at 2169 ("[Petitioner] does not question the validity of [the *Williamson*] finality requirement, which is not at issue here."); *see also* 2 Am. Law. Zoning § 16:12 (5th ed.) ("The Supreme Court's decision in *Knick* overruled *Williamson County* only to the extent that it forced takings plaintiffs to seek just compensation in state court in order to ripen their federal court takings action.  The decision expressly states that it does not affect the other prong of the *Williamson County* ripeness test, which requires takings plaintiffs to obtain a final agency decision in order to establish ripeness.").

71 (7th Cir. 2000) (applying the finality test to a substantive due process claim but not an equal protection claim)).   Accordingly, the Seventh Circuit specifically explained that extending the *Williamson* holding beyond the context of the Takings Clause was "suspect," since the Supreme Court's decision was grounded in the nature of the Just Compensation Clause, citing approvingly Eleventh and First Circuit decisions that declined to apply the finality test to RLUIPA discrimination claims in particular.  *Church of Our Lord*, 913 F.3d at 678 (citing *Temple B'Nai Zion, Inc. v. City of Sunny Isles Beach*, 727 F.3d 1349, 1357 (11th Cir. 2013) (finality test did not apply to RLUIPA discrimination claim); *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 92 (1st Cir. 2013) (same)).[13]

The court did not definitively decide in *Church of Our Lord* whether the finality test applied to a ripeness challenge to RLUIPA claims, and it has not since.  Still, the Seventh Circuit unambiguously signaled that the finality test should not apply in this context. Moreover, defendants have not addressed this decision, much less explained how the Seventh Circuit might find otherwise when asked to address this question head-on.

---

[13]   In fairness, the Seventh Circuit also acknowledged that federal circuits have split on this question, with the Second, Sixth and Ninth Circuits having *applied* the finality test to RLUIPA challenges to zoning ordinances.  *Church of Our Lord*, 913 F.3d at 678 (citing *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342 (2d Cir. 2005); *Miles Christi Religious Order v. Township of Northville*, 629 F.3d 533, 536 (6th Cir. 2010) (religious organization charged in state court with violating zoning ordinance pertaining to parking filed a RLUIPA claim in federal court, which was dismissed as unripe, since the church never requested a variance); *Guatay Christian Fellowship v. City of San Diego*, 670 F.3d 957, 960-64 (9th Cir. 2011) (dismissing aspects of RLUIPA claims related to a church's ability to operate without a use permit for religious assembly, since some issues had not yet been addressed by the city)).  However, whatever uncertainty may remain, this court will follow the Seventh Circuit's guidance.  *See Colby v. J.C. Penney Company, Inc.*, 811 F.2d 1119, 1123 (7th Cir. 1987) (district courts need not give the decisions of other courts of appeals automatic deference).

Accordingly, the court declines to apply the *Williamson* finality test to plaintiffs' RLUIPA claims in this lawsuit.

### B.   Plaintiffs' RLUIPA Claim

Even if ripe, defendants contend that plaintiffs' RLUIPA claim fails because the challenged restriction on their religious practice was not a product of a "land use regulation."  The relevant portion of RLUIPA states that:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution -- (A) is in furtherance of a compelling government interest; and (B) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000cc(a)(1).  Further, "land use regulation" is defined as:

> zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest.

*Id.* § 2000cc-5(5).  "Under this definition, a government agency implements a 'land use regulation' only when it acts pursuant to a 'zoning or landmarking law' that limits the manner in which a claimant may develop or use property in which the claimant had an interest."  *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 998 (7th Cir. 2006) (quoting *Prater v. City of Burnside*, 289 F.3d 417, 434 (6th Cir. 2002)).

Defendants point out that RLUIPA has not been found relevant to the mere enforcement of a local ordinance unless it was enacted pursuant to a zoning or landmarking law. *See Second Baptist Church of Leechburg v. Gilpin Twp.*, 118 F. App'x 615, 616 (3d Cir. 2004) (a local ordinance requiring certain buildings to tap into the sewer system was not a "land use regulation" under RLUIPA); *Prater v. City of Burnside, Ky.*, 289 F. 3d 417 (6th Cir. 2002) (Religious Freedom Restoration Act ("RFRA") inapplicable to claim challenging a city's use of a roadway that affected a church's ability to develop land between two of its properties, since city's decision regarding a roadway was not grounded in any zoning or landmarking law restricting the development or use of the church's private property); *Anselmo v. County of Shasta, Cal.*, 873 F. Supp. 2d 1247 (E.D. Cal. 2012) (county ordinance prohibiting construction of building without permit was not a "land use regulation" subject to challenge under RLUIPA).

Accordingly, defendants argue that since the property was already zoned for The Lion to operate as a church, there was no actual zoning regulation or decision that limited plaintiffs from operating as a church. Rather, plaintiffs' problems related to City ordinance violations. Specifically, after obtaining a building permit in February of 2019, plaintiffs failed to comply with the building code requirements for a place of worship, apply for the necessary inspections, and obtain a Certificate of Occupancy to confirm its compliance. Finally, defendants note that plaintiffs' Third Amended Complaint states that their *eviction* forms the basis for their RLUIPA claim, not even the municipal court proceedings.

While the parties argue at length as to whether the Seventh Circuit would hold that a challenge to municipal ordinances governing building permits for a property falls under

RLUIPA's definition of "land use regulation," none of the cases both sides cite address this question head-on. *See World Outreach Conference Center v. City of Chicago*, 787 F.3d 839 (7th Cir. 2015) (addressing the substantial burden analysis of a RLUIPA claim arising out of a city's allegedly frivolous lawsuit against a religious organization for failing to obtain licenses in accordance with ordinances); *Petra Presbyterian Church v. Village of Northbrook*, 489 F.3d 846, 847 (7th Cir. 2007) (analyzing RLUIPA claim challenging a zoning ordinance that banned religious organizations from operating in an industrial zone). As such, these decisions provide little guidance with respect to whether plaintiffs' claims here implicate a "land use regulation."[14]

Although the court is not prepared to hold that plaintiffs' allegations in their Third Amended Complaint do not fall under RLUIPA's substantial burden section as a matter of law, their ability to survive defendants' motion for summary judgment on the merits of their RLUIPA claim is another matter completely. Plaintiffs claim that defendants (apparently led by defendant Bunnow) conspired to prevent them from following through with the permitting and building code requirements that would allow them to obtain a

---

[14] Plaintiffs also cite two district court decisions from other circuits, which similarly do not speak directly to the issue before this court. *See Layman Lessons, Inc. v. city of Millersville, Tenn.*, 636 F. Supp. 2d 620 (M.D. Tenn. 2008) (a challenge to a proposed zoning ordinance did not support a RLUIPA claim, since the ordinance never passed); *United States v. County of Culpeper, Virginia*, 245 F. Supp. 758 (W.D. Va. 2017) (denying motion to dismiss where a county board denied a permit request from an Islamic group wishing to build a mosque, finding that the county's process regarding approval of the permit at issue was "best understood as a zoning law"). As defendants point out, *Layman* is readily distinguishable because the ordinance was never enacted. With respect to the *Culpepper* decision, however, plaintiffs point out that their plumber was denied a work permit, thus impacting their ability to comply with the building code requirements for a place of worship. Defendants distinguish *Culpepper* based on its procedural posture *and* the fact that the complaint contained allegations of animus towards the religious group, unlike the plaintiffs here who have come forward with no evidence of improper motive. (*See* dkt. #87, at 10-11.) Yet defendants are distinguishing *Culpepper* on the merits of the RLUIPA claim, not whether the claim is cognizable.

30

Certificate of Occupancy to operate as a place of worship.  (Third Am. Compl. (dkt. #60) ¶¶ 32-37, 47, 59.)  The fact that plaintiffs *also* challenge their eviction proceeding in this lawsuit, which did not even arguably involve any City ordinances or use requirements, but instead involved charges that they breached the terms of their lease with Kaur, does not prevent the court from reaching the merit of their RLUIPA claim.  *See Sagamore Park v. City of Indianapolis*, 885 F. Supp. 1146, 1150 (S.D. Ind. 1994) ("When an ordinance constitutes an attempt by the government to regulate the use of a piece of property, it is an act of zoning.").  As explained below, however, the disconnect defendants identify in the thrust of plaintiffs' RLUIPA claim is far better understood and analyzed when framed as a question of whether the ordinances governing the use of the property substantially burdened their ability to practice their religious beliefs.  As addressed in the next section of this opinion, not only have plaintiffs failed to link to any land use regulation a substantial burden, but they have failed to submit evidence of a substantial burden on their religious practices altogether, thus defeating both plaintiffs' RLUIPA and First Amendment claims on the merits.

## III.    RLUIPA and First Amendment Free Exercise Claims

Defendants are entitled to summary judgment as to plaintiffs' RLUIPA and First Amendment claims because no reasonable jury could find that defendants imposed a substantial burden on their religious exercise on this record.  *See Vision Church*, 468 F.3d at 996 ("Given the similarities between RLUIPA's § 2(a)(1) and First Amendment jurisprudence, we collapse Vision's claims for the purpose of [the substantial burden]

analysis; this approach seems most consistent with post-RLUIPA case law.").  The Supreme Court has explained that a "substantial burden" is something that "seriously violates [one's] religious beliefs," regardless of whether alternative means of religious exercise are available.  *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2775 (2014)).  "RLUIPA defines 'religious exercise' to encompass 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief,' including '[t]he use, building, or conversion of real property for the purpose of religious exercise.'"  *Civil Liberties for Urban Believers v. City of Chi.* ("*CLUB*"), 342 F.3d 752, 759 (7th Cir. 2003) (quoting 42 U.S.C. § 2000cc-5(7)).

Defendants do not mention *Holt*, and instead rely on the Seventh Circuit's description of substantial burden in *CLUB* and *Vision Church*, which requires plaintiffs to show that the burden "necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable."  However, since both decision pre-date *Holt*, the Supreme Court's definition of "substantial burden" is obviously controlling.  Indeed, the Seventh Circuit has already accepted that after *Holt*, the burden standard is "much easier to satisfy than our former search for something rendering the religious exercise 'effectively impracticable.'"  *Jones v. Carter*, 915 F.3d 1147, 1149 (7th Cir. 2019) (quoting *Schlemm v. Wall*, 784 F.3d 362, 364 (7th Cir. 2015)).  The Seventh Circuit further explained that the inquiry, post-*Holt*, is whether a restriction "seriously violates" the plaintiffs' religious beliefs, including "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  *Schlemm*, 784 F.3d at 365.  Even so, this clarification of the proper standard is largely academic here, since plaintiffs' evidence of

substantial burden is conclusory, vague, and most importantly, unrelated to any land use regulation or any action taken by defendants.

In particular, as previously noted, plaintiffs' asserted substantial burden on their religious practices is the October 16, 2019, eviction from the property. Critically, they do not take the position that (1) compliance with the City's municipal ordinances would violate their religious beliefs, (2) the costs and inconvenience of compliance posed a substantial burden, or (3) the uncontested municipal court proceedings created a substantial burden on their ability to exercise their religious beliefs. Instead, plaintiffs argue that the eviction caused them to lose "the freedom of association, the freedom to feed the hungry, to communicate, to care for others, to learn, and share ideas." (Dkt. #87, at 44.) Plaintiffs further claim that "unless defendants can demonstrate a compelling government interest after July 15, 2019, virtually any burden imposed is a substantial burden under RLUIPA and the First Amendment." (Pl. Opp'n Br. (dkt. #87) 40.) As plaintiffs see it, as of July 15, 2019, they had come to an agreement with defendant Charanjeet Kaur that marijuana would no longer be distributed from the property, and thus, "there was no longer a nuisance, other than helping to feed, clothe, and shelter people" after that date. (*Id.*) Nevertheless, according to plaintiffs, "[d]efendants invested significant time and effort into forcing Ms. Kaur to help remove the church from Madison's map." (Dkt. #87, at 41.)

Even beyond failing to submit admissible evidence of this alleged agreement with Kaur in accordance with this court's summary judgment procedures, plaintiffs' theory hits another dead end with respect to the government defendants Zilavy, Freedman, or

Bunnow, or any other City official, since plaintiffs offer *no* admissible evidence linking them to the eviction proceedings.   Rather, plaintiffs cite an April 26, 2019, Wisconsin State Journal newspaper article reporting the March 2019 confiscation and April notice of public nuisance, specifically citing a comment that the City could use its zoning ordinances to prevent plaintiffs from continuing to possess and distribute marijuana on the property. Even if admissible (and it is not), plaintiffs still offer no evidence that Kaur worked with Freedman, Zilavy, Bunnow or any other City officials to prevent plaintiffs from complying with prerequisites for obtaining a Certificate of Occupancy to use the property as a church, much less to evict plaintiffs from the property.

The court is, therefore, left with nothing more than evidence that:  Zilavy wrote the April 12, 2019, cease and desist letter pertaining directly to the illicit possession and sale of marijuana on the property; Freedman and Zilavy met with Kaur on April 26, 2019, to discuss the use of the property; and Bunnow exchanged correspondence with plaintiffs' attorney in July 2019 about the ordinance violations, explaining that the "No Occupancy" sign was posted due to hazardous conditions identified by a building inspector.  As likely as it may have been that Freedman and Zilavy discussed with Kaur the problematic possession and distribution of marijuana from the property, there is no evidence allowing a reasonable trier of fact to infer that Freedman, Zilavy and Kaur, in fact, agreed to prevent plaintiffs from pursuing legitimate efforts to operate as a church on the property, a necessary prerequisite to show that a land use regulation substantially burdened plaintiffs' religious practices.  And while Bunnow's July communication with plaintiffs' attorney discussed the ordinance violations, Bunnow explicitly reminded them of their ongoing

obligation to take the necessary additional steps to comply with the place of worship use ordinances.  However, there is no evidence to infer that Bunnow stopped that process.

More to the point with respect to plaintiffs' RLUIPA claim, there is no question that the City's ordinances pertaining to altering the use of a property to a place of worship had *no* bearing on the eviction.  Instead, the question before Dane County Circuit Judge Elkhe was whether plaintiffs' breached the lease because they were using the property for unlawful purposes, and plaintiffs conceded that if the use, possession and distribution of marijuana from the property was unlawful in their circumstances, they breached the terms of the lease.  Rather than invoking any city ordinance, Judge Elkhe's conclusions were similarly linked to the possession and distribution of marijuana, finding that the property was being used for an unlawful purpose, and agreeing that there was little question that the state had a compelling interest in regulating controlled substances.  Moreover, Judge Elkhe made *no* mention of plaintiffs' failure to timely submit permits and seek inspections to make the changes necessary to use the property as a place of worship.  As such, even assuming that defendants or any City officials treated plaintiffs' unfairly during the permitting or inspection process (and again, the evidence does not support such a finding), a reasonable trier of fact would have no basis to conclude that treatment impacted the October 16, 2019, eviction from the property on this record.

Furthermore, even assuming, for the sake of argument that defendants could somehow be implicated in plaintiffs' eviction from the property, evidence that the eviction substantially burdened their religious practices remains undeveloped and cursory. Defendants point out that plaintiffs' tenancy at the building was not connected to their

missions of spreading religious messages and advertising marijuana in exchange for donations. Indeed, The Lion's Facebook screenshots from October of 2018 through March and August of 2020 indicate that The Lion continued its mission to provide marijuana to donating members of the church, and they have continued to spread their religious message as well. Plaintiffs neither dispute that evidence, nor do they submit other evidence detailing how these missions have been adversely impacted by defendants' specific actions, the municipal ordinance violations, or even eviction from the property. In fact, Schworck's few averments about the sincerity of his beliefs is the *only* evidence of a substantial burden, and curiously, plaintiff Bangert has not even submitted a declaration explaining his personal religious beliefs.

Finally, although plaintiffs claim that The Lion's mission includes feeding the hungry, communicating, caring for others and sharing ideas, plaintiffs have not come forward with evidence detailing just how *defendants'* involvement in the events leading up to the eviction (Zilavy's cease and desist order, Freedman's involvement in the investigation of the property, and Bunnow's communications about the ordinances violations) prevented them from carrying out any of these missions; nor have they sought leave to develop this factual record further. To survive defendants' motion for summary judgment, plaintiffs had to connect those dots with evidence, not speculation. *See Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011) (court is not "obliged to research and construct legal arguments for parties, especially when they are represented by counsel"); *Untied States v. Elst*, 579 F.3d 740, 747 (7th Cir. 2009) ("Perfunctory and undeveloped arguments as well as arguments unsupported by pertinent authority are waived.").

For all these reasons, defendants are entitled to summary judgment with respect to plaintiffs' RLUIPA and First Amendment claims.

## IV.    Equal Protection Claim

In evaluating plaintiffs' equal protection claim under the Fourteenth Amendment, the court begins with a fundamental proposition:  a "law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*¸ 508 U.S. 530, 531, 113 S. Ct. 2217 (1993).  Accordingly, a facially neutral ordinance poses an undue burden on religious exercise only if it presents a "grave interference with important . . . religious tenants" or compels people to "perform acts undeniably at odds with fundamental tenets of their religious beliefs."  *Wisconsin v. Yoder*, 406 U.S. 205, 218, 220, 92 S. Ct. 1526 (1972).

Since the parties agree that the applicable ordinances (electrical, heating, ventilating and air conditioning, and the fire code) are facially neutral, plaintiffs' equal protection claim depends on proof that they were improperly singled out for mistreatment by defendants.  To prove this, plaintiffs "must present evidence that [defendants] deliberately sought to deprive [them] of the equal protection of the laws for reasons of a personal nature unrelated to the duties of the defendant[s'] position."  *Hilton v. City of Wheeling*, 209 F.3d 1005, 1008 (7th Cir. 2000).  "The paradigmatic 'class of one' case . . . is one in which a public official, with no conceivable basis for his action other than spite or some other

improper motive (improper because unrelated to his public duties) comes down hard on a hapless private citizen." *Lauth v. McCollum*, 424 F.3d 631, 633 (7th Cir. 2005).

Thus, to succeed on their class-of-one claim, plaintiffs must prove that they were "intentionally treated differently from others similarly situated." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

> To be similarly situated for purposes of a class-of-one equal protection claim, the person alleged to have been treated more favorably must be identical or directly comparable to the plaintiff in all material respects. [*Srail v. Village of Lisle*, 588 F.3d 940, 943 (7th Cir. 2009); *Racine Charter One, Inc. v. Racine Unified Sch. Dist.*, 424 F.3d 677, 680 (7th Cir. 2005). While this is not a "precise formula," it is nonetheless "clear that similarly situated individuals must be very similar indeed." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004).

*Reget v. City of La Cross*, 595 F.3d 691, 695 (7th Cir. 2010).

Plaintiffs point to the allegedly preferential treatment of three other churches, but none of these churches is a proper comparator. To begin, plaintiffs point to the treatment of The Vine Church, directing the court to a March 16, 2017, Facebook post advertising that it would be in a new building in two weeks (*see* Attach B (dkt. #87-2) 1), despite the date of their final Certificate of Occupancy being February 28, 2019. Thus, plaintiffs maintain, the City permitted the Vine Church to operate as a place of worship for almost two years, while The Lion was only permitted to operate without a Certificate of Occupancy for two months. Unsurprisingly, defendants' object to the Facebook post on hearsay and authentication grounds, and plaintiffs have not explained how they might cure these deficiencies. But even assuming that this evidence were admissible at trial, a Facebook posting announcing that The Vine Church would be in a new building is not

proof that the Vine Church *was* open and operating as a church on property that did not have a Certificate of Occupancy as a place of worship.

Moreover, even supposing that Vine Church *was* allowed to function as a church for two years before receiving a Certificate of Occupancy for that use, this "evidence" would not support a reasonable trier of fact finding intentional mistreatment of The Lion by defendants, because there are too many obvious differences between The Vine Church and The Lion with respect to how they went about modifying the use of their property.  As an initial matter, no evidence of record suggests that any of the individual defendants were aware of The Vine Church's use of the property without a Certificate of Occupancy.  There are also material differences between The Lion's and The Vine Church's approach to changing the use of their respective properties.  Not only did The Vine Church submit building-code compliant plans and obtained required permits, there is no suggestion that The Vine Church prevented an inspector from entering their building; rather, the chronology of The Vine Church's path towards its Certificate of Occupancy shows that it was making ongoing efforts to obtain permits, do necessary work, and arrange for final inspections.  On the other hand, The Lion did not submit any building code compliant plans for the change of use, and it did not obtain approval from the building inspector and fire inspectors.  The only step plaintiffs suggest they took towards addressing the issues Sjolander identified in May of 2019 appears to be hiring a plumber to fix the building's sump pump, but this was one of numerous issues that needed to be addressed before The Lion could obtain a Certificate of Occupancy.  In sum, there is no basis for a reasonable trier of fact to conclude that any of the defendants intentionally mistreated The Lion

because The Vine Church was allowed to operate without a Certificate of Occupancy for a longer period of time than The Lion.

Plaintiffs' other two comparator churches, The Journey Church and Blackhawk, are even further afield in terms of proof of preferential treatment. Plaintiffs point out these properties were conveyed to these churches, and then the churches operated the properties without paying fees for permits or change of use, suggesting that these two churches *never* obtained a Certificate of Occupancy to operate as a church. However, this scenario is wholly unsupported by evidence, as well as rebutted by defendants. While plaintiffs cite a link to a City of Madison database for permit reports, they do not explain how this website establishes that either church was operating without a Certificate of Occupancy, and defendants submitted evidence that *both* properties had, indeed, been approved for use as a church, and received Certificates of Occupancy to function as a church *before* the properties were even conveyed. Accordingly, no reasonable trier of fact could find that The Journey Church or Blackhawk Evangelical Free Church received preferential treatment over The Lion.

Finally, plaintiffs' theory that they were victims of a conspiracy to enforce Wisconsin's drug laws fail as a matter of law. Although not articulated as a separate cause of action, it is worth noting that to state a claim under 42 U.S.C. § 1985(3), a plaintiff must allege that defendants conspired for the purpose of depriving, "either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws," and that the conspirators did, or caused to be done, an act in furtherance of that conspiracy which injured the plaintiff or his property or

deprived him of his constitutional rights. *Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971). Here, plaintiffs have offered no evidence even hinting at the City of Madison permitting any other church or religious group to violate drug laws or to distribute marijuana. As such, even assuming plaintiffs could direct the court to evidence that the defendants intended to stop The Lion from distributing marijuana, that intent would not support a reasonable finding that defendants' actions were based on personal animus toward plaintiffs. *See Dauel v. Board of Trustees*, 768 F.2d 128, 131 (7th Cir. 1985) ("[T]here is no principle that unequal enforcement of a state statute or regulation is unconstitutional, unless, of course, the inequality has some invidious purpose . . . .") (citing *Oyler v. Boles*, 368 U.S. 448, 456 (1962)); *Ciechon v. City of Chicago*, 686 F.2d 511, 522-23 (7th Cir. 1982) (equal protection "protects against intentional invidious discrimination by the state against persons similarly situated") (citation omitted).

While plaintiffs obviously disagree as to whether they must follow Wisconsin drugs laws, they have not identified any conduct by defendants Freedman, Zilavy or Bunnow suggesting that the actions they took were unrelated to the enforcement of those laws or the City's ordinances. Since plaintiffs have not shown that they were treated worse than others similarly situated in the City for an improper purpose, defendants are entitled to summary judgment on plaintiffs' Fourteenth Amendment equal protection claim as well.

## V.    Fifth and Fourteenth Amendment Due Process claim.

Defendants further seek summary judgment as to plaintiffs' due process claim. "To prevail on a procedural due process claim, 'a plaintiff must establish that a state actor deprived him of a constitutionally protected liberty or property interest without due

process of law.'" *Hinkle v. White*, 793 F.3d 764, 767 (7th Cir. 2015) (quoting *Dupuy v. Samuels*, 397 F.3d 493, 503 (7th Cir. 2005)).  The analysis of a due process claim requires the court to consider (1) whether the state has interfered with a liberty or property interest and (2) if so, whether the procedures relating to that interference met constitutional standards.  *Id.*  A substantive due process violation occurs when the state exercises "its power without reasonable justification and in a matter that 'shocks the conscience.'" *Bettendorf v. St. Croix Cty.*, 631 F.3d 421, 426 (7th Cir. 2011) (quoting *Tun v. Whitticker*, 398 F.3d 899, 902 (7th Cir. 2005)).  Relevant here, a violation in the context of land use restrictions arise when the government makes "decisions that are arbitrary and unreasonable, bearing no substantial relation to the public health, safety or welfare." *Doherty v. City of Chicago*, 75 F.3d 318, 325 (7th Cir. 1996).

Plaintiffs do not even address the elements of either a procedural or substantive due process claim.  Instead, plaintiffs point to non-defendant Sjolander's handling of the charged ordinance violations, maintaining that he unfairly and prematurely posted the "No Occupancy" sign on the property.  However, this claim, too, fails as a matter of law.  First, plaintiffs offer no legal or factual basis for Sjolander's conduct to be attributed to any of the named defendants.  Second, plaintiffs have not come forward with evidence that any of Sjolander's decisions were wholly unrelated to public health, safety or welfare.  On either of these grounds, as with plaintiffs' other claims against the individual defendants, a reasonable trier of fact would have to find against plaintiffs.[15]

---

[15] To the extent plaintiffs' § 1983 claims against the individual defendants might be a close call, they are also entitled to qualified immunity, which "protects government officials from damages

## VI.    *Monell* Claim Against the City of Madison

Finally, plaintiffs' claim against the City of Madison itself fails as a matter of law. Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), to state a claim against a municipality, plaintiff must allege the constitutional violation was "caused by: (1) an official policy adopted and promulgated by [the city's] officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). A custom cannot be established through a single incident. *Palmer v. Marion Cty*, 327 F.3d 588 (7th Cir. 2003).

As an initial matter, plaintiffs' failure to make a colorable showing of a constitutional violation by any of the individual defendants dooms their *Monell* claim against the City. Even assuming any of these defendants' actions amounted to a constitutional violation because they were targeting plaintiffs for the illegitimate purpose or preventing them from practicing their sincerely held religious beliefs, plaintiffs have not submitted admissible evidence linking that constitutional violation to a formal policy,

---

liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (quoting *Estate of Clark v. Walker*, 865 F.3d 544, 549-50 (7th Cir. 2017)). In particular, plaintiffs have directed the court to no Supreme Court or Seventh Circuit decision providing clear notice that their actions related to The Lion's use of the property at 555 West Mifflin violated constitutional or statutory rights. The contrary is the case, at least with respect to the enforcement of state drug laws. *See White v. Ozelie*, No. 19-cv-646, 2019 WL 2060135, at *3 (E.D. Wis. May 9, 2019) (citing *United States v. Israel*, 317 F.3d 768, 772 (7th Cir. 2003); *United States v. Jefferson*, 175 F. Supp. 2d 1123, 1131 (N.D. Ind. 2001); *United States v. Rush*, 738 F.2d 497, 513 (1st Cir. 1984)) (dismissing challenge to confiscation of marijuana, since marijuana is contraband and courts have "repeatedly rejected" argument that there is a constitutional right to possess marijuana). As such, even if any of plaintiffs' claims had arguable merit, these defendants would be entitled to summary judgment with respect to any claims for monetary damages against them.

custom or practice, final decision of a municipal policy maker, or a failure to train or supervise by the City.  To the contrary, plaintiffs only point to statements from the newspaper articles from 2019, reporting that defendant Zilavy stated that she met with Kaur to discuss options for dealing with the plaintiffs' possession and distribution of marijuana on the property.  According to the articles, Zilavy allegedly said that building code violations would be prosecuted if not remedied, and plaintiffs would need to go through a plan process and a lot of construction to operate the church.  Similarly, Freedman allegedly said that the police department was "very supporting of the other ongoing tracks for this address including Building Inspection and the eviction process."  Ignoring the obvious hearsay problems, plaintiffs cite to the April 26, 2019, Wisconsin State Journal article, which does *not* include statements by either Zilavy or Freedman.  (*See* dkt. #87-13.)

Plaintiffs also claim that Zilavy's and Freedman's supposed comments are evidence of a City policy of targeting certain neighborhoods for more intense housing inspection, this time citing as support a City document titled "Department of Planning and Community and Economic Development, Building Inspection Division," which endorses home inspections in certain neighborhoods.  *See* https://www.cityofmadison.com/council/documents/resource/14-17DPCED-BID.pdf  (last visited 5/6/2021).  Again, no reasonable trier of fact could rely on this "evidence."  First, that document was dated December 2020, well after the plaintiffs were evicted from the property.  Second, plaintiffs do not submit evidence suggesting that that the property was even located in one of the neighborhoods targeted for home inspections.  Third, the record

does not suggest that the property at issue in this case was targeted for "systematic code enforcement"; rather, the undisputed facts indicate that Sjolander went to the property in May of 2019 as a follow-up to plaintiffs seeking a permit to alter the use of their building and identified a number of hazardous conditions.  Indeed, plaintiffs' own evidence shows that Sjolander had been emailing with plaintiffs in March of 2019 about their need to make adjustments to comply with the place of worship requirements.

Thus, plaintiffs' *Monell* claim against the City fails as a matter of law as well, not only for want of an underlying constitutional violation, but because plaintiffs have not shown that the violation was the product of any unconstitutional City policy, practice or custom.

## VII.   Remaining State Law Claims

This lawsuit is not completely resolved by defendants' motion for summary judgment as to all of plaintiffs' federal claims, since plaintiffs' Third Amended Complaint included claims under Article 1 §§ 1, 3, 4, 8 and 18 of the Wisconsin Constitution.  (Dkt. #60 ¶ 27.)  Because the court has found that defendants are entitled to summary judgment on plaintiffs' federal claims, the court would typically not decide plaintiffs' state law claims on the merits, but instead would dismiss those claims without prejudice refiling in state court.  This practice is consistent with "the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999); *see also* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise

supplemental jurisdiction over a claim under subsection (a) if the district court has dismissed all claims over which it has original jurisdiction.").

However, a court may depart from "usual practice," and continue to exercise supplemental jurisdiction, if the circumstances weigh in favor of such action. For example, a court need not send back to state court "'doomed litigation' that will only be dismissed once it gets there." *Groce*, 193 F.3d at 502. In such circumstances, the district court should retain supplemental jurisdiction "because when a state-law claim is clearly without merit, it invades no state interest -- on the contrary, it spares overburdened state courts additional work that they do not want or need -- for the federal court to dismiss the claim on the merits, rather than invite a further, and futile, round of litigation in the state courts." *In re Repository Tech., Inc.*, 601 F.3d 710, 725 (7th Cir. 2010) (internal quotation omitted). This principle applies here with respect to plaintiffs' request for monetary damages under state law.

The Wisconsin Constitution does not authorize suits for money damages except in the context of a takings claim. *See Goodvine v. Swiekatowski*, 594 F. Supp. 2d 1049, 1054 (W.D. 2009) (citing *W.H. Pugh Coal Co. v. State*, 157 Wis. 2d 620, 634–35, 460 N.W.2d 787, 792–93 (1990) (holding that plaintiff could sue state for money damages arising from unconstitutional taking of property because Article I, Section 13 of the Wisconsin Constitution requires that state provide "just compensation" when property is taken); *Jackson v. Gerl*, 2008 WL 753919, *6 (W.D. Wis. 2008) ("Other than one very limited exception inapplicable to this case, I am not aware of any state law provision that allows

an individual to sue state officials for money damages arising from a violation of the Wisconsin Constitution.")).

Since plaintiffs' claims do not involve a taking of property requiring compensation from the state, their claims for damages under the Wisconsin Constitution will also be dismissed with prejudice. To the extent plaintiffs are seeking an injunction for a violation of their rights under the Wisconsin Constitution, this court cannot address that request for relief. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104 S. Ct. 900 (1984) (state sovereign immunity prohibits federal courts from ordering state officials to comply with state law). Thus, any remaining claim under the Wisconsin Constitution for injunctive relief will be dismissed without prejudice.

### ORDER

IT IS ORDERED that:

1) Defendants City of Madison, Jason Freedman, Jennifer Zilavy and Kyle Bunnow's motion for summary judgment (dkt. #71) is GRANTED.

2) Defendant Charanjeet Kaur is DISMISSED WITHOUT PREJUDICE pursuant to Federal Rule of Civil Procedure 4(m).

3) Plaintiffs' claims for monetary damages under the Wisconsin Constitution are DISMISSED WITH PREJUDICE; plaintiffs' claims for injunctive relief under the Wisconsin Constitution are DISMISSED WITHOUT PREJUDICE.

4) The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 6th day of May, 2021.

BY THE COURT:
/s/
WILLIAM M. CONLEY
District Judge